UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SODA MOUNTAIN WILDERNESS
COUNCIL and KLAMATH FOREST
ALLIANCE,

                              NO. CIV. S-04-2583 LKK/CMK

       Plaintiffs,

    v.                            O R D E R

GAIL NORTON, et al.,

       Defendants.
_____/

    Plaintiffs, the Soda Mountain Wilderness Council (SMWC) and
the Klamath Forest Alliance (KFA), have brought suit against the
Bureau of Land Management (BLM) (and its relevant officials and
parent agency).  They allege that the agency has violated the
National Environmental Policy Act (NEPA), the Administrative
Procedure Act (APA), and the Federal Land Policy and Management Act
(FLPMA).  The suit arises out of a proposed amendment to the land
management plan for the Redding Resource Area concerning
acquisitions of land for the Horshoe Ranch Wildlife Area (HRWA).

1

1   The parties have both filed cross-motions for summary judgment and

2   submitted an additional round of briefing at the court's request

3   on the question of standing.

**I.**

**FACTS**

**A.   THE HORSESHOE RANCH WILDLIFE AREA**

7       In 1977 the California Department of Fish and Game (CDF&G)

8   bought the B.B. Miller cattle ranch to protect the principle

9   wintering grounds of the Jenny Creek black-tail deer herd.  Excerpt

10  of Record (ER) 013; Administrative Record (AR) 00112.  This action

11  established the Horseshoe Ranch Wildlife Area as a public deer

12  habitat preserve.  It is located just south of the California-

13  Oregon border, east of Interstate 5 and north of the Klamath River.

14  Id.  Miller's land was checkerboarded alongside one-mile square

15  sections of public land managed by the Bureau of Land Management.

16  Id.; Map at ER 030; AR 00136.  Since then, BLM and the CDF&G have

17  co-managed the checkerboarded ranch as a Wildlife Area.  CDF&G has

18  taken the leadership role in wildlife management pursuant to a 1983

19  Memorandum of Understanding between the two agencies.  ER 013; AR

20  00112, 05288-05319.  CDF&G has managed primarily to enhance and

21  protect deer winter range habitat, and provide public access for

22  hunting and other recreational pursuits.  Id.

23      At the time of the original purchase, only the lands outlined

24  on Map 3 of the Final EA were fenced as a part of the B.B. Miller

25  Ranch.  ER 013, AR 00112; Map at ER 030, AR 00136.  Sections 22 and

26  34, located on the western boundary of the fence, were already in

2

BLM ownership but were used for grazing by other ranchers.  ER 013,

AR 00112.  In 1983 the CDF&G and BLM completed a Habitat Management

Plan that included Sections 22 and 34 as part of the HRWA.  Id.

Although outside the fenced boundaries, the CDF&G has administered

the HRWA with sections 22 and 34 considered part of the wildlife

area. Id.

In 1992, the eastern half of section 21, T. 48N., R.6W.,

contiguous with section 22, was acquired by a land exchange

consistent with the existing Management Framework Plan, with the

intention of including it in the HRWA.  Id.  The final

configuration of land being actively managed as a wildlife area by

the CDF&G in 1992 was the original ranch plus one half of Sections

21[1] and all of Sections 22, and 34.  Id.

**B.   THE 1993 REDDING RESOURCE AREA MANAGEMENT PLAN**

In June 1993, the Redding Resource Area BLM, issued a Record

of Decision (1993 ROD) for the Redding Resource Management Plan

(RRMP). ER 070.  The new Redding Resource Management Plan (1993

RRMP), declared itself a "compact with the public" resulting from

a "four year process of collaboration with the public, State

agencies, other Federal agencies, and, especially county

governments and local organizations." ER 070.  One goal of the

plan was to "dramatically shift" the BLM land ownership pattern

"from more than 1,000 scattered parcels to less than twenty five

---

[1]   It appears that the eastern half of section 21 may not have
been a formal part of the HRWA boundary although it was effectively
treated as a portion of the boundary by being managed that way.
See AR 00112 and 00115.

large aggregates of accessible and useful public lands" with "outstanding recreational opportunities and unusual or imperiled biological resources." Id.  One of the specific objectives of the 1993 RRMP was to "double the size" of the HRWA "to benefit deer." ER 071.  This would be accomplished by disposing of the widely scattered, and thus hard to manage public lands, in favor of concentrating management on a few consolidated areas with unique resource values.  AR 00112, CD#1.  "Expansion of public land administration westward would complement public management . . . [i]n Oregon, enhance public accessibility, and provide more effective long term protection of the interstate deer herd." ER 080.

The 1993 RRMP listed as objectives for Horseshoe Ranch:

1. Improve the existing public administered deer winter ranch habitat and afford long-term protection for additional privately owned deer winter range habitat in cooperation with California Department of Fish and Game, Oregon Department of Fish and Wildlife and Ashland Resource Area BLM;
2. Allow long-term natural restoration of riparian zones to Class II or better;
3. Offer semi-primitive non-motorized recreation opportunities;

ER 076.

The 1993 RRMP identified a new boundary for Horseshoe Ranch and identified it as an area that would be a focus for long term management.  AR 00118.  The new boundary included public land, as well as approximately 7,000 acres of privately held land to the west of Horseshoe Ranch.  AR 00112.

////

4

1   It was intended that BLM would consider acquisition of land
2   made available by willing sellers within the 1993 RRMP Horseshoe
3   Ranch boundary, and once purchased, to manage the land consistent
4   with the RRMP management objectives and land use allocations for
5   Horseshoe Ranch. AR 00112, 00119, 00127;  ER 077.  Under the 1993
6   RRMP, if land was purchased within the Horseshoe Ranch boundary,
7   no further RRMP amendment would be needed to manage the land as
8   part of Horseshoe Ranch. AR 00112.

9   The redrawing of the Horseshoe Ranch boundary in 1993 did not
10  expand the amount of public land in Horseshoe Ranch or the amount
11  of land that was being actively managed as part of Horseshoe Ranch.
12  AR 00120.  Despite the boundary shown in the RRMP, the BLM
13  administrative boundary remained the boundary shown in the 1983
14  Habitat Management Plan.  AR 00120.

15  The Final Environmental Impact Statement for the RRMP measured
16  impacts to deer populations primarily in terms of the number of
17  acres placed into or removed from public stewardship. ER 082-83.

18  **C.   AMENDMENTS TO THE 1993 RRMP**

19  Within a year of the 1993 ROD, the RRMP was amended by the
20  Northwest Forest Plan.  ER 124.  Although the Northwest Forest Plan
21  dealt primarily with spotted owl habitat, it recognized the Soda
22  Mountain area, which includes the HRWA[2]. It said:

23      This  decision  recognizes  the  special  biological
        qualities  of  this  unique  area  and  directs  the  BLM  to
24

25      [2]  The government notes that the citation does not state that
    the HRWA is within the Soda Mountain Area, although it is not clear
26  whether they dispute the fact or just the citation.

                                5

1   evaluate carefully the values of the Soda Mountain area
2   as a biological connectivity corridor and propose any
    additional management protection necessary, including a
    special designation, through the BLM resource management
3   plan, to protect those values.

4   ER 126.

5   **D.   THE CASCADE SISKIYOU ECOLOGICAL EMPHASIS AREA AND NATIONAL
         MONUMENT**

6

7        The Northwest Forest Plan also established the Cascade

8   Siskiyou Ecological Emphasis Area (CSEEA), primarily because of

9   its "unique diverse ecological and biological characteristics."

10  ER 098.  The majority of the CSEEA was in Oregon, and the Medford

11  BLM was given the primary responsibility for producing a management

12  plan.  Id.; ER 107, CSEEA Alternative A Map 39.  One of the major

13  decisions for the planning process was establishment of the

14  boundary.  ER 101.  Four of the five alternative boundaries

15  included some portion of the Horseshoe Ranch within the CSEEA

16  boundary.  ER 106-16.  Three of the five alternatives included the

17  area currently in question as an active acquisition interest area.

18  Id.

19       Planning for the CSEEA was cut short by the declaration of the

20  Cascade Siskiyou National Monument.[3]  The public comment period for

21  the CSEEA's draft EIS was scheduled to end on June 14, 2000, ER

22  097, but the new monument was proclaimed by the President on June

23  9, 2000, ER 119, Proclamation No. 7318, 65 FR 37249 (June 13,

24  _____

25       [3]  The Cascade Siskiyou National Monument was created
    to protect its "unmatched" biological diversity, and value as
    "biological crossroads" among many other more specific values.  ER
26  119, Proclamation No. 7318, 65 FR 37249 (June 13, 2000).

1   2000).  This obviated the need for any further planning for the

2   CSEEA.  ER 117, AR 05048.

3       Although the boundary of the Monument coincided with the state

4   line, the Medford and Redding BLM agreed that since "ecological

5   processes of the natural landscape are not constrained by

6   administrative borders," they would manage all the ecologically-

7   contiguous areas in the HRWA consistent with the "principles and

8   policies explicit in the Presidential Proclamation."  ER 178-80.

9       On the California side of the border, two sections of land

10  within the acquisition interest area of the HRWA were offered for

11  sale to the BLM in 1995.  ER 014, AR 00113.  During the public

12  participation process initiated by the BLM, private landowners in

13  the vicinity of the HRWA expressed opposition to federal

14  acquisition of additional lands.  Id.  Some private landowners and

15  neighbors expressed fears that federal acquisitions would result

16  in a loss of county tax base and that "their traditional livestock

17  operations and way of life on private lands were threatened with

18  being prohibited."  Id.  The Siskiyou County Board of Supervisors

19  requested that the BLM amend the Redding Resource Area to reduce

20  the boundary of the HRWA back to the original 1977 size.  Id.; see

21  also ER 127 (letter dated Aug. 10, 1999 from Siskiyou County Board

22  of Supervisors).  As a result of the concerns raised, BLM withdrew

23  from the purchase of the parcels. AR 00113.

24      In February of 2000, the BLM announced that it would begin a

25  process to consider amending the boundary of the HRWA.  The first

26  step was issuing a notice of intent to consider the proposal by

7

1  Siskiyou County to amend the RRMP Horseshoe Ranch boundary and to

2  initiate public scoping.  ER 014, AR 00113, 00437-38.

3  **E.   THE 2003 RRAMP AMENDMENT PROCESS**

4      **1.   Scoping**

5      In February of 2000, the BLM announced a 30-day scoping review

6  for a proposed amendment to reconsider the boundary of the HRWA.

7  ER 014, AR 00113; see also ER 134, AR 00435, 65 Fed. Reg. 11,074

8  (Mar. 1, 2000).  The Federal Register did not mention the concerns

9  about erosion of ranching lifestyles, loss of tax base, or any of

10 the other concerns that had led to the request by the Siskiyou

11 County Board of Supervisors.  ER 134, AR 00435; 65 Fed. Reg. 11,074

12 (Mar. 1, 2000).  The notice declared that a "proposal" had been

13 received to "review the existing boundary" and that the

14 alternatives will include expansion, reduction, and no action.  Id.

15 BLM held several public meetings in Siskiyou County prior to the

16 issuance of the EA to explain the proposal to amend the RRMP

17 Horseshoe Ranch boundary. AR 00113.  Over 700 comments were

18 received.  ER 014, AR 00113.

19     The California Department of Fish and Game (CDF&G) with whom

20 the BLM co-managed the area expressed the following comments about

21 the possible reduction in acquisition interest area in the HRWA:

22        In our initial review of the RMP, we voiced concern
          about loss of public opportunity because there was a net
23        loss of public lands. That concern was mitigated by
          features in the RMP that provided for the acquisition of
24        lands from willing sellers that included wetlands in the
          Shasta Valley and lands between Interstate 5 and the
25        western boundary of the Horseshoe Ranch Wildlife Area.
          . . . The existing Horseshoe Ranch which we
26        cooperatively manage is receiving increasing public use

8

1      and the habitat improvement projects we have implemented
2      have resulted in improved habitat for wildlife. Given
that we feel it is very important that the RMP continue
to provide direction to acquire lands from willing
3      sellers within the designated area.

4  ER 135-36, AR 04254-55.

5      Felice Pace, of Klamath Forest Alliance, a plaintiff in this

6  case, also commented on the amount of lands disposed of and

7  acquired by the agency:

8      BLM managers have "privatized" over 17,000 acres in this
county and have another 21,000 plus "in process" for
9      privatization. Yet, to date the BLM has only acquired
about 1,700 acres in spite of the fact that there are
10     willing seller's in the areas designated in the RMP for
acquisition. THIS IS TOTALLY UNACCEPTABLE PERFORMANCE.
11

12     . . . the EIS must fully disclose the performance of the
Redding BLM under the 199[3] Plan including the amount
13     of land in Siskiyou County that was planned for disposal
and acquisition and the actual amounts disposed of and
14     acquired, as well as the reasons for the performance.

15  ER 137-38, AR 04369-70.

16      Klamath Forest Alliance also commented on the importance of

17  the area as a biological corridor and asked that the BLM consider

18  recent scientific studies in the area:

19     . . . This area has incredible biological importance as
one of only three low-elevation breaches of the Cascade
20     Range.

21     . . . the EIS must consider all the biological
information collected through the KNF's Partners in
22     Flight Program. This data documents the importance of
the Klamath Corridor. For example, the program has found
23     large numbers of willow flycatchers migrating through
the Klamath Corridor. The EIS must also fully consider
24     scientific information in the recent assessment by Jim
Strittholdt and Reed Noss, and recent investigations
25     into the need for movement corridors in the NW to
facilitate wildlife recolonization of areas from which
26     they were previously extirpated.

9

1  Id.

2      Similarly, the California Wilderness Coalition, in a joint

3  comment with the North Group of the Sierra Club Redwood Chapter

4  specifically asked the BLM to consider the role of the Horseshoe

5  Ranch "in providing regional habitat connectivity for plants and

6  wildlife." ER 139.  They also requested that the BLM consider how

7  the various alternatives would influence the adjacent CSEEA.  Id.

8  Many commenters also asked the BLM to expand the HRWA acquisition

9  interest area.  See ER 140-44.

10      **2.   The Draft Environmental Assessment**

11      A Draft Environmental Assessment (DEA) was published for

12  comment in December of 2001, AR 00323, a year and a half after the

13  declaration of the Cascade Siskiyou National Monument. ER 119,

14  Proclamation No. 7318, 65 FR 37249 (June 13, 2000).  The DEA was

15  circulated for a 60 day public comment period.  AR 00323.  BLM

16  received over 2,200 letters, postcards, emails and faxes commenting

17  on the draft EA.  AR 01049-04238G.

18      The DEA had three alternatives.  AR 00341-00342.  Alternative

19  One reduced the boundaries of the HRWA to that of the original B.B.

20  Miller ranch.  AR 00341; Map at AR 00343.  It excluded sections 21,

21  22, and 34, the unfenced section of the HRWA immediately to the

22  west of the Miller ranch fence, and made them available for

23  disposal to the private sector.  Id.  Alternative Two also shrank

24  the RRMP boundaries, but continued to include sections 21, 22, and

25  34 along the western border.  AR 00342 (DEA); Map at AR 00344.

26  ////

1   Alternative Two initially provided management direction for

2   acquisition interest in a substantially larger region than the 1993

3   RRAMP.  Id.  Specifically, it provided for the acquisition of

4   private lands in the entire 1993 boundary plus lands to the south.

5   Id.  While this alternative provided official management direction

6   in the text to acquire land if a willing seller offered it, no

7   published map showed any official acquisition area boundary.

8   Acquisitions were specifically limited to land offered by willing

9   sellers, lands with high quality deer habitat, and undeveloped

10  lands (lands where improvements represented less than 20% of the

11  total value of the lands).  Id.  Alternative Three was the No

12  Action alternative.  Id.; Map at 00345.  It would have kept the

13  1993 RRMP boundaries and policy of acquisition of private lands

14  from willing sellers within the boundaries drawn in 1993.

15      CDF&G, the BLM's co-managers of the HRWA, supported

16  Alternative Two at least partly because of the expanded acquisition

17  interest area.  ER 157, AR 01065-67.  Specifically, CDF&G said that

18  alternative represented "the greatest opportunity to retain and

19  enhance deer winter range and other habitat near the HRWA and best

20  meets the increasing public demand for recreational opportunities

21  in the area."  ER 156, AR 01066.  CDF&G further stated that:

22          [t]he HRWA provides important winter range habitats for
            deer and supports a wide variety of other species of
23          wildlife. Although deer occupy the HRWA year-round, most
            are migratory with the majority of the population
24          summering in Oregon. The condition and the extent of
            deer winter range on the HRWA and surrounding lands are
25          critical to the health and persistence of deer herds in
            this region.
26

ER 156, AR 01066.  CDF&G also reiterated their concern about the possibility of reducing the acquisition interest area:

> In our initial review of the existing 1993 RMP, we expressed concern about the reduction in public lands and loss of public recreational opportunity proposed under that plan. Our concern was mitigated by features of the plan that provided for acquisition of lands west of the HRWA as well as wetlands in the Shasta Valley. This would have enhanced public use and resource values by more effectively configuring BLM lands. However since adoption of the RMP the BLM has disposed of 16,928 acres of public land and acquired only 1,657 acres of private land in Siskiyou County. None of those lands purchased by BLM were located in the vicinity of the HRWA.

Id.

The Oregon Department of Fish and Wildlife (ODFW) strongly supported Alternative 3, the no action alternative, because they believed it would provide the best wildlife management opportunity. ER 153-54, AR 01078-79.  ODFW stated:

> Southern Oregon and Northern California is home to one of the few migratory black-tailed deer herds in the Northwest. They summer in Oregon in the Siskiyou and Cascade Mountains, and winter along the California/Oregon border and south to the Klamath River.
>
> Populations of black-tailed deer in southwest Oregon have declined substantially in the last 10 years. Currently populations in the Rogue Unit are 35 to 40% below management objectives. Contributing factors to this decline are believed to be predation, diseases, development on winter ranges, and declining quantity and quality of forage on both summer and winter ranges. In the years 1994 through 1999, 120 deer in the south Cascade and Siskiyou Mountains of Oregon and California (many in the HRWA) were trapped and fitted with radio collars. The movements of these deer were monitored throughout the year in order to document summer and winter ranges and migration routes. The area identified as critical winter range in the RRMP is consistent with the telemetry data from this study. We were not able to collar as many deer to the west of the HRWA. However, we expect deer densities to the west to be similar to those

12

in the HRWA.

. . . Habitat improvement and long-term protection can be best accomplished through public administration. Because this is one of the last large undeveloped tracts of deer winter range in the region, and because of the critical need to provide long-term protection, ODFW supports the adoption of Alternative 3: The No Action Alternative; Implement the Redding RMP.  Id.

### 3.  The Final Environmental Assessment

On May 1, 2003, BLM revised the draft EA and issued the Proposed Plan Amendment to the Redding RMP and Environmental Assessment for the Horseshoe Ranch Wildlife Area (Proposed Plan Amendment and Final EA or FEA). ER 011, AR 00105, 00108.   BLM received four protests on the Proposed Plan Amendment and Final EA. AR 00799-00867.   The FEA analyzed the proposed amendment and three alternatives. AR 00105.   This proposed alternative eventually became the selected alternative in the Decision Record.   ER 002, AR 00003.

The proposed amendment changes the procedure required for acquisition of private lands to be added to Horseshoe Ranch.   AR 00124.   The RRMP amendment consolidates the RRMP Horseshoe Ranch boundary with the BLM administrative boundary.   AR 00124.   The selected alternative used the formal boundaries described in Alternative Two but eliminated all mention of acquisition interest. ER 024, AR 00125.   Instead, it stated that "only property immediately contiguous[4] to the HRWA boundary could be considered" and then only acquired if it met certain specified criteria.   AR

---

[4]  Elsewhere it states it must be "presently contiguous" to the existing HRWA to be considered.   ER 024, AR 00125.

00115.  Additional criteria include winter deer habitat,
recreational access, vulnerability of the property to development,
consistency with the RRMP and land disposal acquisition goals, and
"other management concerns."  Id.  The Final EA states that "BLM
would consider private landowners' offer to sell adjacent lands for
addition to the HRWA only if the private parcels are immediately
adjacent to the boundary, and only if the land meets criteria for
deer winter habitat."  AR 00003; 00015.  The only explanation in
the FEA for the elimination of an acquisition interest area in
Alternative 2 was that it was "confusing."  ER 015, AR 00114.

Any land acquired under these circumstances could only be
formally added to the HRWA by a plan maintenance action and the
completion of a new EA.  Id.  Subsequent acquisitions after the
acquisition of the "presently contiguous" parcels would be treated
differently. ER 016, AR 00115.  "Any subsequent proposed
acquisitions of land not presently contiguous to the HRWA boundary
would require a new plan amendment."  Id.  The Final EA states that
"BLM would consider private landowners' offer to sell adjacent
lands for addition to the HRWA only if the private parcels are
immediately adjacent to the boundary, and only if the land meets
criteria for deer winter habitat."  AR 00003; 00015.  In other
words, if the first layer of lands presently contiguous to the HRWA
were ever acquired, BLM would prohibit itself from acquiring a
second layer of contiguous land in the HRWA region without engaging

1  in an entire RRAMP amendment process.[5]

2       **4.   The Record of Decision**

3        On March 9, 2004, the BLM formally adopted the Proposed

4  Amendment when it released its Decision Record and Finding of No

5  Significant Impact (FONSI). ER 001-06, AR 00002-03.   The RRMP

6  amendment redrew the RRMP boundary of Horseshoe Ranch to

7  incorporate only public land, excluding all private lands.   AR

8  00115;  ER 002, AR 00003; <u>see</u> map ER 007, AR 00008.  Under the 1993

9  RRMP Horseshoe Ranch boundary, only public land was being managed

10  as Horseshoe Ranch.  AR 00120.  It declared that BLM would

11  "continue to manage for multiple uses, including permitted

12  livestock grazing, on the approximately 1,200 acres in the western

13  portion of the HRWA." ER 002, AR 00003.  The FEA identifies these

14  approximately 1,200 acres as sections 21, 22, and 34 that are

15  currently outside the fenced boundary. ER 024, AR 00125.

16       Consistent with the Selected Alternative, the Decision

17  eliminated the 1993 RRAMP acquisition interest area.  ER 002, AR

18  00003.  The ROD further stated that:

19       BLM has publicly expressed its intention to balance the
         approximately 17,000 acres of public land transferred
20       from Federal ownership in Siskiyou County since 1993 by
         acquisitions of environmentally sensitive lands in other
21       parts of the County. For this reason, and in response to
         a 1999 request by Siskiyou County, BLM eliminates the
22       extensive area identified in alternatives 2 and 3 for
         potential federal acquisition of private lands. BLM does

23

24       [5]  The government disputes the interpretation, stating that
     the record does not say that contiguous lands have to be purchased
25   first.  The record, however, provides that "[a]cquired lands not
     contiguous with the RRMP amendment boundary would require an RRMP
26   amendment to be managed as part of Horseshoe Ranch."

1    not actively pursue new acquisitions in connection with
2    HRWA.

3    Id.  Plaintiffs point out that no explanation is provided of how

4    relinquishing its plan to acquire private land will "balance" the

5    Agency's disposal of 17,000 acres of public land against the 1,600

6    acres it acquired.

7                                  **II.**

8                                **STANDARDS**

9        Summary judgment is appropriate when it is demonstrated that

10   there exists no genuine issue as to any material fact, and that the

11   moving party is entitled to judgment as a matter of law.  Fed. R.

12   Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144,

13   157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th

14   Cir. 1995).

15       Under summary judgment practice, the moving party

16           [A]lways bears the initial responsibility of
             informing the district court of the basis of
17           its motion, and identifying those portions of
             "the pleadings, depositions, answers to
18           interrogatories, and admissions on file,
             together with the affidavits, if any," which
19           it believes demonstrate the absence of a
             genuine issue of material fact.
20

21   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

22   nonmoving party will bear the burden of proof at trial on a

23   dispositive issue, a summary judgment motion may properly be made

24   in reliance solely on the 'pleadings, depositions, answers to

25   interrogatories, and admissions on file.'"  Id.  Indeed, summary

26   judgment should be entered, after adequate time for discovery and

1    upon motion, against a party who fails to make a showing sufficient

2    to establish the existence of an element essential to that party's

3    case, and on which that party will bear the burden of proof at

4    trial.  See id. at 322.  "[A] complete failure of proof concerning

5    an essential element of the nonmoving party's case necessarily

6    renders all other facts immaterial."  Id.  In such a circumstance,

7    summary judgment should be granted, "so long as whatever is before

8    the district court demonstrates that the standard for entry of

9    summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

10   at 323.

11       If the moving party meets its initial responsibility, the

12   burden then shifts to the opposing party to establish that a

13   genuine issue as to any material fact actually does exist.

14   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

15   586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

16   391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

17       In attempting to establish the existence of this factual

18   dispute, the opposing party may not rely upon the denials of its

19   pleadings, but is required to tender evidence of specific facts in

20   the form of affidavits, and/or admissible discovery material, in

21   support of its contention that the dispute exists.  Fed. R. Civ.

22   P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l

23   Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

24   1998).  The opposing party must demonstrate that the fact in

25   contention is material, i.e., a fact that might affect the outcome

26   of the suit under the governing law, Anderson v. Liberty Lobby,

1  Inc., 477 U.S. 242, 248 (1986); <u>Owens v. Local No. 169, Assoc. of</u>
2  <u>Western Pulp and Paper Workers</u>, 971 F.2d 347, 355 (9th Cir. 1992)
3  (quoting <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>,
4  809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,
5  i.e., the evidence is such that a reasonable jury could return a
6  verdict for the nonmoving party, <u>Anderson</u>, 477 U.S. 248-49; <u>see</u>
7  <u>also</u> <u>Cline v. Industrial Maintenance Engineering & Contracting Co.</u>,
8  200 F.3d 1223, 1228 (9th Cir. 1999).

9      In the endeavor to establish the existence of a factual
10 dispute, the opposing party need not establish a material issue of
11 fact conclusively in its favor.  It is sufficient that "the claimed
12 factual dispute be shown to require a jury or judge to resolve the
13 parties' differing versions of the truth at trial."  <u>First Nat'l</u>
14 <u>Bank</u>, 391 U.S. at 290; <u>See also</u> <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.
15 Thus, the "purpose of summary judgment is to 'pierce the pleadings
16 and to assess the proof in order to see whether there is a genuine
17 need for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R.
18 Civ. P. 56(e) advisory committee's note on 1963 amendments); <u>see</u>
19 <u>also</u> <u>International Union of Bricklayers & Allied Craftsman Local</u>
20 <u>Union No. 20 v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405 (9th Cir.
21 1985).

22      In resolving the summary judgment motion, the court examines
23 the pleadings, depositions, answers to interrogatories, and
24 admissions on file, together with the affidavits, if any.  Rule
25 56(c); <u>See also</u> <u>In re Citric Acid Litigation</u>, 191 F.3d 1090, 1093
26 (9th Cir. 1999).  The evidence of the opposing party is to be

1   believed, <u>see</u> <u>Anderson</u>, 477 U.S. at 255, and all reasonable
2   inferences that may be drawn from the facts placed before the court
3   must be drawn in favor of the opposing party, <u>see</u> <u>Matsushita</u>, 475
4   U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654,
5   655 (1962) (<u>per</u> <u>curiam</u>)); <u>See also</u> <u>Headwaters Forest Defense v.</u>
6   <u>County of Humboldt</u>, 211 F.3d 1121, 1132 (9th Cir. 2000).
7   Nevertheless, inferences are not drawn out of the air, and it is
8   the opposing party's obligation to produce a factual predicate from
9   which the inference may be drawn. <u>See</u> <u>Richards v. Nielsen Freight</u>
10  <u>Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d
11  898, 902 (9th Cir. 1987).

12      Finally, to demonstrate a genuine issue, the opposing party
13  "must do more than simply show that there is some metaphysical
14  doubt as to the material facts. . . . Where the record taken as a
15  whole could not lead a rational trier of fact to find for the
16  nonmoving party, there is no 'genuine issue for trial.'"
17  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

18                              **III.**

19                            **ANALYSIS**

20  **A.   STANDING**

21      Before reaching the merits of the plaintiffs' case, the court
22  must determine whether the Soda Mountain Wilderness Council (SMWC)
23  and/or the Klamath Wilderness Forest Alliance (KWFA) have standing
24  to bring this challenge under NEPA, FLPMA, and the APA. <u>Steel Co.</u>
25  <u>v. Citizens for a Better Environment</u>, 523 U.S. 83, 102 (1998)
26  (standing is a threshold jurisdictional question).

                                19

1    There are two different elements to the standing inquiry.

2 First, the plaintiffs must demonstrate that they have standing

3 under Article III which requires a demonstration that:

4         (1) [plaintiffs have] suffered an "injury in fact" that
          is (a) concrete and particularized and (b) actual or
5         imminent, not conjectural or hypothetical; (2) the
          injury is fairly traceable to the challenged action of
6         the defendant; and (3) it is likely, as opposed to
          merely speculative, that the injury will be redressed by
7         a favorable decision.

8 Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,

9 528 U.S. 167, 181 (2000).  For the SMWC and KWFA to show that they

10 have standing to sue as associations on behalf of their members,

11 they must demonstrate that one or more of its members would have

12 standing to sue in their own right, that "the interests at stake

13 are germane to the organization's purpose, and neither the claim

14 asserted nor the relief requested requires the participation of

15 individual members in the lawsuit." Id.

16    Secondly, in order to bring suit under the APA the plaintiffs

17 must prove that the interests they seek to protect fall under the

18 interests that NEPA was designed to protect.  Kootenai Tribe of

19 Idaho v. Veneman, 313 F.3d 1094 (9th Cir. 2002).  Section 702 of

20 the APA provides that "[a] person suffering legal wrong because of

21 agency action, or adversely affected or aggrieved by agency action

22 within the meaning of a relevant statute, is entitled to judicial

23 review thereof."  5 U.S.C. § 702.

24    From all that appears, the defendants concede that the

25 plaintiffs' interests fall within the "zone of interests" sought

26 to be protected by NEPA and/or the FLPMA.  The defendants contest,

20

1   however, whether those interests have actually been affected by the
2   action in question, and whether plaintiffs have demonstrated an
3   injury in fact that is fairly traceable to the impacts of the
4   amendment.  Defs.' Br. at 7; see also Lujan v. National Wildlife
5   Federation, 497 U.S. 871, 883 (1990); Desert Citizens Against
6   Pollution v. Bisson, 231 F.3d 1172, 1179 (9th Cir. 2000).

7        Plaintiffs have demonstrated that they have broad recreational
8   and environmental interests in the well being of the HRWA and the
9   surrounding property.  Defendants claim that those interests are
10  not affected by the proposed action because "BLM's action will not
11  result in any changes to the public lands within Horseshoe Ranch
12  that Plaintiffs' members may use or enjoy."  Defs.' Br. at 7.  By
13  implication, the defendants appear to contend that since the
14  surrounding land is private, plaintiffs can claim no right to
15  contest the government's policy towards that land.  The argument
16  does not lie.  An ability to use the adjacent land is simply not
17  a requisite for standing.

18       The Ninth Circuit has specifically held that plaintiffs need
19  not have access to land in order to demonstrate that they have an
20  interest in the environmental protection of that land.  In Cantrell
21  v. City of Long Beach, the court concluded that plaintiff bird-
22  watchers had standing to challenge the adequacy of an Environmental
23  Impact Statement prepared by the Navy to support the proposed
24  closure and later development of a naval base.  241 F.3d 674, 680
25  (9th Cir. 2001).  The Navy argued that because the plaintiffs had
26  "no legal right to enter the closed station and gaze over the

property line at the birds and their habitat" they could not

establish standing.  Id. at 680-81.  The court noted that

plaintiffs had "visited the areas in and around the station to

observe the habitats" of the various bird species, and found that

the removal of the bird habitats would affect their interest in

future birdwatching in the area.  Id. at 680.  The court concluded

that

> we have never required a plaintiff to show that he has
> a right of access to the site on which the challenged
> activity is occurring, or that he has an absolute right
> to enjoy the aesthetic or recreational activities that
> form the basis of his concrete interest. If an area can
> be observed and enjoyed from adjacent land, plaintiffs
> need not physically enter the affected area to establish
> an injury in fact.

Id. at 681 (citing Laidlaw, 528 U.S. at 182); see also Save Our

Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005)

(finding that although the development in question was private

plaintiff had standing to sue "to preserve wildlife-viewing

opportunities, both for its residents and others from publicly

accessible locations.").

As Cantrell teaches, it is not necessary for the plaintiffs

to prove only harm to the public lands already owned by BLM and the

CDF&G to have standing.  The plaintiffs have standing because the

proposed action may affect the manner in which the private lands

are managed in the future, a cognizable interest despite the

plaintiffs lack of a right to access to the land.  The declarations

submitted by plaintiffs demonstrate that at least some of the

organizations' members regularly travel to the edges of the public

1 property.  For instance, David Willis avers that he has

2      ridden to the very edges of the property in question at
3      least three dozen times.  In fact, several of the best
       trail rides on which I regularly take visitors pass
       right by these areas.  During these trip[s] the area in
4      question is regularly in sight, and the ecological
       effects of the management of private lands can be
5      readily observed.

6 Dec. of Willis at ¶¶ 3-4; Dec. of Felice Pace at ¶¶ 3 ("I have been

7 to very edges of the property in question several times from the

8 backcountry, and drive by it, and observe it from Highway 5.").

9      Moreover, even if Cantrell was not dispositive, it appears

10 that plaintiffs would have standing.  As they argue, there is

11 record evidence that it is expected that there will be increased

12 use of the public lands.  See, e.g., AR 04254-55 (the CDF&G noted

13 that "the existing Horseshoe Ranch which we cooperatively manage

14 is receiving increasing public use.").  Common sense suggests that

15 if the BLM does not acquire additional lands there will be adverse

16 impact on the existing public land by virtue of its more intense

17 use.  Moreover, it is equally foreseeable that development on

18 adjacent private land will adversely impact wildlife within the

19 greater Soda Mountain area.

20      The maintenance of a healthy herd of Jenny Creek deer is a

21 goal that is set out in the RRMP, and one that could possibly be

22 hindered if there is greater impact on the public lands or if the

23 private lands are developed.  See Final EA, AR 00112 ("The HRWA is

24 managed primarily to enhance and protect deer winter range habitat

25 and provide public access for hunting and other recreational

26 pursuits."); see also 1993 RRMP at 1, ER 071 (If the RRMP was

1  adopted the "BLM would double the size of the Horseshoe Ranch

2  habitat Management Area to benefit deer.") and 4-20, ER 082 ("if

3  current population growth in the northern part of the state

4  continues as predicted development will adversely impact deer

5  winter range habitat.").

6      The court wishes to emphasize that here it is not deciding

7  that there will be any significant impact on the environment.  All

8  that is necessary for standing, however, is a causal connection

9  between the interests of the plaintiffs and the action taken by the

10  BLM.  See, e.g., Kootenai Tribe of Idaho v. Veneman 313 F.3d 1094,

11  1112 (9th Cir. 2002).  There, plaintiffs who had "ownership

12  interests in land next to the national forests" had standing to

13  challenge under NEPA a Roadless Rule being implemented in the

14  national forest.  The Circuit held that there was a "sufficient

15  geographical nexus to the site of the challenged project that they

16  may be expected to suffer whatever environmental consequences may

17  result from implementation of the Roadless Rule."  Id. (citing

18  Davis v. Coleman, 521 F.2d 661, 671 (9th Cir. 1975)).  Here, the

19  plaintiffs have a cognizable interest in how changes in adjacent

20  land management may affect the existing HRWA lands and the wildlife

21  that rely upon the area.  See Dec. of Carol Wright at ¶ 3

22  (explaining that the "geographic area of interest for SMWC includes

23  the entire Soda Mountain area, particularly the Cascade-Siskiyou

24  National Monument, the Horseshoe Ranch Wildlife Area, and all the

25  lands in the vicinity that contribute to improving the ecological

26  health and aesthetic value of these areas.").

1        The declarations submitted by plaintiffs also demonstrate that
2    they have an interest in expanded public recreation areas and thus
3    may be affected by the impact the proposed amendment to the RRMP
4    may have on the public land that is available in the broader area.
5    See Dec. of Carol Wright at ¶¶ 11, 18; Dec. of Felice Pace at
6    ¶¶ 5, 6 (stating that he approved of the 1993 RRMP "because it
7    would clearly allow for more area in which to hike, and appreciate
8    the backcountry" as well as "improve the overall ecological
9    condition, and aesthetic quality of the area.").

10        Finally, defendants' contention that plaintiffs lack standing
11    because the proposed amendment will not effect any changes on the
12    public lands, appears to address a merits issue rather than a
13    standing issue.  Plaintiffs need not demonstrate, for the purpose
14    of the standing analysis, that actual environmental harm will
15    occur, that question is reserved for the case's merits.  See Hall
16    v. Norton, 266 F.3d 969, 976 -977 (9th Cir. 2001); Ecological
17    Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141, 1152 (9th
18    Cir. 2000) ("the causal connection put forward for standing
19    purposes cannot be too speculative, or rely on conjecture about the
20    behavior of other parties, but need not be so airtight at this
21    stage of the litigation as to demonstrate that the plaintiffs would
22    succeed on the merits.").  Rather, plaintiffs need only to show
23    that some of their interests might be affected by the final agency
24    action.  Hall v. Norton, 266 F.3d 969, 976 -977 (9th Cir. 2001)
25    ("The purpose of the standing doctrine is to ensure that the
26    plaintiff has a concrete dispute with the defendant, not that the

25

1  plaintiff will ultimately prevail against the defendant. . . .

2  Rather, [plaintiff] need only establish the reasonable probability

3  of the challenged action's threat to his concrete interest.");

4  Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1179

5  (2000).  It is seems clear that a policy which would either

6  eliminate or drastically reduce the ability of BLM to acquire

7  additional lands would not at least have the possibility of

8  impacting the interests discussed above.

9      This court raised on its own a standing question not advanced

10 by the defendants.  The court requested further briefing because

11 it was unclear whether Congressional approval would be required for

12 BLM to actually acquire adjacent land.  If that had been the case,

13 arguably the court would have been faced with a situation similar

14 to Department of Transportation v. Public Citizen, 541 U.S. 752

15 (2004).  There, the Supreme Court held that "where an agency has

16 no ability to prevent a certain effect due to its limited statutory

17 authority over the relevant actions, the agency cannot be

18 considered a legally relevant 'cause' of the effect."  Id. at 770.

19     As the parties' further briefing demonstrates, the BLM may

20 acquire land in the Horseshoe Ranch area through two different

21 means.  The first, purchase of land from a willing seller, requires

22 that BLM seek funding from Congress.  The second, and preferred

23 approach, land exchanges, does not require congressional approval.

24      In a declaration, Charles Wright, the Supervisory Realty

25 Specialist for the Redding Field Office, avers that "approximately

26 1,700 acres have been acquired through exchange" in Siskiyou

County, including an exchange for 320 acres in the Horseshoe Ranch

Management Area.  Dec. of Charles Wright at 2.  Wright set out

eight primary steps (documents) required for a land exchange:

> 1) development of the proposal; 2) preparation of a
> feasibility report; 3) Agreement to Initiate Land
> Exchange; 4) Notice of Exchange Proposal (NOEP); 5)
> National Environmental Policy Act (NEPA) analysis and
> documentation and appraisal; 6) Notice of Decision; 7)
> Binding Agreement and appraisal update(s) as needed; 8)
> Title Transfer/Escrow.

Id.  These exchanges may be "initiated by any person, corporation,

or legal entity or may be initiated by the BLM."  Id.  Defendants

also note that "it would be possible for BLM to acquire land

through donation or use of non-federal funding sources."  Defs.'

Supp. Br. at 3.

Plaintiffs have demonstrated a host of different concerns

which may be impacted by the proposed amendment.  The court is

therefore satisfied that plaintiffs have demonstrated that they may

suffer an "injury in fact" that is within the "zone of interests"

that NEPA and FLPMA were designed to protect.

**B.    THE CENTRAL DISPUTE**

It appears to the court that central to the case is a dispute

about what the proposed amendment would do if it was made final.

BLM argues that they are merely consolidating the overall RRMP

Horseshoe Ranch boundary with what they describe as the "BLM

administrative boundary."[6]   While acknowledging that this would

---

[6]  Apparently, the "BLM administrative boundary" refers to the
boundary between the public lands that are managed by BLM and those
private lands which were part of the so called "acquisition area,"
but not otherwise managed by the BLM.

1   eliminate the acquisition area from the Horseshoe Ranch boundary,

2   defendants claim this will have no effect upon the opportunity for

3   further acquisitions.  They assert that "lands contiguous with the

4   Horseshoe Ranch boundary would continue to be evaluated for

5   acquisition"[7] although inclusions of those lands "would require a

6   plan maintenance action."[8]  Defs.' Br. at 4.  For those lands not

7   currently contiguous, however, it would take an RRMP amendment to

8   add them to Horseshoe Ranch.[9]  It thus appears that lands not

9   contiguous to the "administrative boundary" would not "continue to

10  be evaluated for acquisition."

11         The plaintiffs characterize the amendment differently.  First,

12  they note that along with only looking to acquire lands "presently

13  contiguous" to the existing public lands, BLM included a list of

14  criteria that must be met which were not in the original 1993 RRAMP

15  and which would make it less likely that land would be acquired.

16  They further note that if the private lands contiguous to the

17  existing public lands were acquired, then BLM would be prohibited

18  _____

19         [7]  This contention clearly contradicts the EA.  After stating
     that it will eliminate the acquisition area, the EA states that
20   "BLM does not actively pursue new acquisitions in connection with
     HRWA."  AR 00005.

21         [8]  The FLPMA regulations provide that maintenance on a
     management plan: "is not considered a plan amendment and shall not
22   require the formal public involvement and interagency coordination
     process described under §§ 1610.2 and 1610.3 of this title or the
23   preparation of an environmental assessment or environmental impact
     statement.  Maintenance shall be documented in plans and supporting
24   records."  43 C.F.R. § 1610.5-4.

25         [9]  An amendment requires the preparation of either an EA or
     an EIS and a public involvement procedure as set out in the
26   regulations. 43 C.F.R. § 1610.5-5.

1  from acquiring lands in the next layer without an amendment.  Thus,

2  plaintiffs believe that this amendment would make it less likely,

3  if not impossible, for private lands to be acquired in the future.

4      The question at issue is whether the procedural change has the

5  possibility of having on-the-ground impacts, either as direct,

6  indirect or cumulative impacts on the greater Soda Mountain area.

7  See 40 C.F.R. §§ 1502.16, 1508.7, 1508.8(a-b), 1508.25(c); Idaho

8  Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir.

9  2002)(requiring the consideration of direct, indirect, and

10 cumulative impacts for an EA as well as an EIS); Kern v. U.S.

11 Bureau of Land Management, 284 F.3d 1062, 1076 (9th Cir. 2002).

12 **C.    APPLICATION OF NORTON v. SOUTHERN UTAH WILDERNESS ALLIANCE**

13     Defendants claim that the Supreme Court decision in Norton v.

14 Southern Utah Wilderness Alliance, 542 U.S. 55 (2004)(SUWA),

15 prohibits plaintiffs from obtaining the remedy they seek under

16 FLPMA.  They maintain that SUWA held that ordinarily the goals set

17 out in BLM management plans are not binding commitments that the

18 agency can be forced to follow via the APA's grant of authority to

19 the court to "compel action unlawfully withheld or unreasonably

20 delayed."  5 U.S.C. § 706(1).

21     In SUWA the court was reviewing an action brought by

22 environmental plaintiffs who sought to compel the BLM to better

23 manage wilderness study areas in compliance with goals set out in

24 the land use plan for that area.  542 U.S. 55.  The Court concluded

25 that FLPMA's general statutory directive that "BLM manage land in

26 accordance with land use plans, and the regulatory requirement that

29

1  authorizations and actions conform to those plans" when combined
2  with a statement in the plan that BLM "will" take a certain action
3  did not rise to the level of a binding commitment that could be
4  compelled under the APA.

5      The Court explained that a statement in a land use plan that
6  the agency "will" do something was not sufficient "at least absent
7  clear indication of binding commitment in the terms of the plan."
8  Id. at 69.  The Court observed, however that an action called for
9  in a plan may be compelled "perhaps when language in the plan
10 itself creates a commitment binding on the agency."  Id. at 71.

11     The present action is distinguished from SUWA in a number of
12 ways.  The first distinction is the relief sought in SUWA and the
13 relief sought in the matter at bar.  In SUWA the plaintiffs were
14 seeking to compel agency action assertedly "unlawfully withheld or
15 unreasonably delayed."  See § 706(1).[10]  Here, BLM has taken a
16 final agency action which is independently reviewable under a
17 separate section of the APA requiring the court to "hold unlawful
18 and set aside agency action, findings, and conclusions found to be
19 arbitrary, capricious, an abuse of discretion, or otherwise not in
20 accordance with law."  5 U.S.C. § 706(2)(A).  Rather than seeking
21 to enforce what the Supreme Court describes as a "non-imperative"
22 mandate under § 706(1), the plaintiffs are able to avail themselves
23 of § 706(2)(A) because the BLM is amending the Redding Resource

24 _____

25     [10]  This is also true for the case that defendants recently
   submitted.  The Wilderness Society v. Norton, __ F.3d __, 2006 WL
26 89195 (D.C. Cir. 2006).

1  Management Plan, thus committing to a final decision.

2      A second ground distinguishes the matter at bar from <u>SUWA</u>.

3  The Record of Decision adopting the 1993 RRMP states:

4      The public impressed upon BLM the desire to consolidate
       public lands in areas with outstanding recreational
5      opportunities and unusual or imperiled biological
       resources.  Conversely, existing public lands with
6      limited recreational potential and/or commonplace
       natural resources were identified for disposal.  *This
7      document represents BLM's commitment to these public
       desires and constitutes a compact with the public*.

8

9  <u>See</u> Excerpt of Record to Plaintiffs' Opening Brief at 70.

10 (Emphasis added).  Plaintiffs contend that this language is the

11 binding commitment the Supreme Court said might be sufficient to

12 allow for an enforcement action under § 706(1).  The court must

13 concur.  If this language does not, despite its plain terms,

14 constitute a commitment, then no language would suffice.  It seems

15 clear that the agency went out of its way to make clear it was

16 committing to a certain process, and withdrawing from that "compact

17 with the public" would appear to subject the agency to suit under

18 § 706(1).

19     Plaintiffs, however, sued under § 706(2)(A), thus suggesting

20 that summary judgment under 706(1) may be inappropriate.[11]

21 ////

22

23     [11]  <u>But see</u> Fed. R. Civ. P. 54(c) ("except as to a party
       against whom a judgment is entered by default, every final judgment
24     shall grant the relief to which the party in whose favor it
       rendered is entitled, even if the party has not demanded such
25     relief in the party's pleadings.").  Given the court's disposition,
       I need not consider whether plaintiffs are entitled to judgment
26     under § 706(2)(A).

1  Nonetheless, the commitment is still significant since

2      While the scope of review under the "arbitrary and
       capricious" standard is narrow and a court is not to
3      substitute its judgment for that of the agency, the
       agency nevertheless must examine the relevant data and
4      articulate a satisfactory explanation for its action. In
       reviewing that explanation, a court must consider
5      whether the decision was based on a consideration of the
       relevant factors and whether there was a clear error of
6      judgment.

7  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.

8  Ins. Co., 463 U.S. 29, 30-31 (1983).  Thus, this court must

9  determine whether all the "relevant factors" were considered when

10 the agency decided to adopt the amendment under review.  Nothing

11 suggests the agency considered the commitment noted above in the

12 matter under consideration.  I turn now to whether the agency's

13 action fails the arbitrary and capricious test in other ways as

14 well.

15 **D.    REVIEW UNDER NEPA AND THE APA**

16     While there is a presumption that a federal agency acted in

17 good faith and that agency action is valid, this does not waive the

18 court's obligation to ensure that the agency took a "hard look at

19 the environmental consequences of its actions."  Friends of the

20 Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 993 (9th

21 Cir. 1993); Overton Park, 401 U.S. 402, 416 (1971); Akiak Native

22 Community v. U.S. Postal Service, 213 F.3d 1140, 1146 (9th Cir.

23 2000).  The court is to defer to a "fully informed and

24 well-considered agency decision, but [it] need not forgive a clear

25 error of judgment."  Churchill County v. Norton, 276 F.3d 1060,

26 1071 (9th Cir. 2001) (internal quotations omitted).

1  **E.    FLMPA'S REQUIREMENTS**

2      FLMPA regulations contain a plain requirement that an EA or

3  an EIS must be prepared prior to the amendment of a Resource

4  Management Plan.  43 C.F.R. § 1610.5-5.  They further require that

5  "[i]n all cases, the effect of the amendment on the plan shall be

6  evaluated." Id.  Thus, the applicable regulations require that the

7  EA under review must not only examine the impact that the amendment

8  may have on the Horseshoe Ranch area, but also must examine the

9  greater impact that the amendment will have on the 1993 Redding

10 Resource Management Plan.

11     Defendants aruge that the action under review only continues

12 the status quo and thus does not require full environmental review.

13 Given FLPMA's specific mandate, however, the argument cannot

14 prevail.  At a minimum, an adequate environmental assessment is

15 necessary to determine whether the amendment may have a significant

16 environmental impact, inter alia, on the management plan.

17 **F.    PURPOSE OF THE AMENDMENT**

18     The NEPA regulations require that the EA prepared by the BLM

19 "include brief discussions of the need for the proposal, of

20 alternatives as required by sec. 102(2)(E), of the environmental

21 impacts of the proposed action and alternatives, and a listing of

22 agencies and persons consulted." 40 C.F.R. § 1508.9.  This purpose

23 statement is an obvious place for the court to start when analyzing

24 the adequacy of an environmental impact statement or an

25 environmental assessment.  It is from this statement that the

26 agency, public, and, ultimately, the court may begin to judge

33

1  whether the agency has fully analyzed the possible impacts of the
2  action and reviewed a reasonable range of alternatives to that
3  action.

4        Chapter II of the EA prepared by the BLM in the matter at bar
5  is entitled "Purpose of the Proposed Amendment."  AR 00120.
6  Curiously, despite its title, the section never actually
7  articulates the purpose; rather, the section explains what the
8  document analyzes.  It explains that "[t]his document analyzes a
9  proposed change to the HRWA boundary along with three alternatives.
10 Also addressed are the BLM land acquisition policy related to the
11 HRWA and management of livestock grazing."  Id.

12       Defendants' brief acknowledges that the need for the action
13 is "not well articulated in the EA."  Defs.' Br. at 13.  Instead,
14 the agency refers the court to the background information and the
15 administrative record.  Id.  Unfortunately, the material referred
16 to again does not make clear exactly what the agency was attempting
17 to accomplish by the plan amendment.  While the Bureau's reticence
18 makes analysis more difficult, it does not render it impossible.

19       As noted in § I of this opinion, the Bureau action appears to
20 have been prompted by a controversy which arose when BLM considered
21 purchasing two sections of land which were offered for sale in the
22 acquisition interest area.  AR 00113.  Certain members of the
23 public objected to the purchase and BLM withdrew from the sale.
24 Id.  The Siskiyou County Board of Supervisors then requested that
25 the BLM amend the RRMP to reduce the size of the acquisition area
26 that was set out in the 1993 Plan.  See AR 00447-48.  The Notice

34

1  of Intent issued by BLM explains that it has received this letter,

2  but merely states that it "will consider a proposal to amend the

3  existing boundary of the Horseshoe Wildlife Area" without expanding

4  upon why the amendment is necessary, or even desirable. AR 00435.

5      The failure of the agency to clearly define the purpose and

6  scope of its action can be seen in the section entitled "Issues

7  Considered, Then Dismissed from Full Analysis." AR 00121.  There

8  the agency explains that "for a variety of reasons many of the

9  comments received from the public were beyond the scope of the

10  analysis" and were therefore not considered fully. <u>Id.</u>  Some of

11  the comments "went beyond the geographic scope of the undertaking."

12  Again, however, given the paucity of exposition, it is difficult

13  to understand what that scope was.  Here, again the failure to

14  articulate the purpose and scope raises serious questions as to the

15  adequacy of the agency's action.  The agency dismissed some public

16  comment from consideration on the grounds that it was beyond a

17  geographic scope which was undefined, making analysis of the

18  propriety of that conduct impossible.

19      Along with helping to define the needed alternatives, the

20  purpose section serves another important role in the NEPA scheme.

21  NEPA is not a substantive statute, it is not designed to prohibit

22  agencies from undertaking projects which may have a significant

23  effect on the environment; it is designed, however, to ensure that

24  the agency is candid about the action it is taking. <u>See Robertson</u>

25  <u>v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989) (NEPA

26  "guarantees that the relevant information will be made available

35

1  to the larger audience that may also play a role in both the

2  decisionmaking process and the implementation of that decision.").

3  NEPA requires candor since its scheme contemplates public input

4  into the decisionmaking process.

5      "Congress wanted each federal agency spearheading a
       major federal project to put on the table, for the
6      deciding agency's and for the public's view, a
       sufficiently detailed statement of environmental impacts
7      and alternatives so as to permit informed decision
       making. The purpose of NEPA is to require disclosure of
8      relevant environmental considerations that were given a
       'hard look' by the agency, and thereby to permit
9      informed public comment on proposed action and any
       choices or alternatives that might be pursued with less
10     environmental harm."

11 Lands Council v. Powell, 395 F.3d 1019, 1027 (9th Cir. 2005); 43

12 C.F.R. §§ 1500.1(b); 1500.2(d).  In sum, NEPA forces agencies to

13 explain what it is they seek to do, why they seek to do it, what

14 the environmental impacts may be of their proposed action, and what

15 alternatives might be available to the agency that might lessen

16 environmental impact.  Without a clear "what and why" statement,

17 the public is kept in the dark.  To put it differently, NEPA does

18 not prohibited the government from taking actions for what ever

19 political, ecological or economic reasons motivate the proposed

20 action.  It does, however, require a transparent process so that

21 the public is informed about their choices.

22     Defendants seek to cure the EA's inadequacy in defining the

23 undertaking by arguing that the purpose for the proposed amendment

24 was "to clarify the public lands which are managed as Horseshoe

25 Ranch."  Defs. Br. at 13.  Defendants' effort is without effect.

26 ////

1   It is established that the court is not permitted to accept post-

2   hoc rationalizations.  <u>Gifford Pinchot Task Force v. U.S. Fish and</u>

3   <u>Wildlife Service</u>, 378 F.3d 1059, 1071 (9th Cir. 2004) (rejecting

4   a post-hoc rationalization of a Biological Opinion "because such

5   explanations provide an inadequate basis for judicial review. . .")

6   (<u>citing Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402,

7   419 (1971)); <u>California v. Norton</u>, 311 F.3d 1162, 1176 (9th Cir.

8   2002) (setting aside an agency's post hoc invocation of a

9   categorical exclusion because it "does not provide assurance that

10  the agency actually considered the environmental effects of its

11  action before the decision was made.").  Moreover, as I now

12  explain, even given the tendered rationale, the EA fails to meet

13  NEPA standards.

14  **G.    ALTERNATIVES**

15       A discussion of alternatives is required in both an EIS and

16  an EA.  40 C.F.R. § 1508.9(b); <u>Bob Marshall Alliance v. Hodel</u>, 852

17  F.2d 1223, 1225 (9th Cir. 1988).  The agency here considered three

18  different alternatives in the Draft EA.  AR 00341-342.  The first

19  alternative reduced the boundaries of the HRWA to that of the

20  original B.B. Miller Ranch.  AR 00341.  The second also reduced the

21  boundaries, but by a smaller amount, still including sections 21,

22  22, and 34 along the western border, while also containing an

23  acquisition interest in an area wider than that set out by the 1993

24  RRMP that was currently in place.  AR 00342.  The third, and final,

25  alternative was the no-action alternative which would have kept the

26  1993 RRMP boundaries and acquisition policies.  <u>Id.</u>

1    The selected alternative matched that of Alternative 2 but

2    eliminated the acquisition area originally proposed in that

3    alterative.  AR 00124.

4        **1.   What does the Alternatives Analysis Require?**

5    NEPA is designed to encourage the public agency to take into

6    account the impacts of its decision, and the primary method that

7    NEPA created to encourage this is through the consideration of

8    alternatives.  42 U.S.C. § 4332(2)(E) (Agency is to "study,

9    develop, and describe appropriate alternatives to recommended

10   courses of action in any proposal which involves unresolved

11   conflicts concerning alternative uses of available resources.");

12   City of Sausalito v. O'Neill, 386 F.3d 1186, 1207 (9th Cir. 2004)

13   ("The alternatives section is 'the heart of the environmental

14   impact statement.'" (quoting 40 C.F.R. § 1502.14)).  By examining

15   both the environmental impacts of the desired path and the impacts

16   of other reasonable alternatives, NEPA enables an agency, and the

17   public it serves, to evaluate whether the government has other

18   options it could take that might be less damaging to the natural

19   environment.  Headwaters, Inc. v. Bureau of Land Management, 914

20   F.2d 1174, 1180 (9th Cir. 1990) ("[T]he touchstone for our inquiry

21   is whether an EIS's selection and discussion of alternatives

22   fosters informed decision-making and informed public

23   participation.") (citing California v. Block, 690 F.2d 753, 767

24   (9th Cir. 1982)).

25   ////

26   ////

1       The range of alternatives to be considered and objectively

2   evaluated is to be determined based upon those reasonably related

3   to the purposes of the project.  Resources Limited, 35 F.3d at

4   1307; City of Angoon v. Hodel, 803 F.2d 1016, 1021-22 (9th Cir.

5   1986).  The agency has no obligation to consider alternatives which

6   are infeasible, or those whose effects are remote and speculative

7   such that they cannot be reasonably ascertained.  Vermont Yankee,

8   435 U.S. at 551.  Nor does the agency have to consider every

9   possible alternative, only a reasonable range sufficient to inform

10  the public and the agency of the possible alternative options which

11  could be selected.  Headwaters, 914 F.2d at 1180-81.  For those

12  alternatives not selected for detailed study, the agency is

13  required to "briefly discuss the reasons for their having been

14  eliminated."  40 C.F.R. § 1502.14(a).

15      The court reviews the agency's selection and discussion of

16  alternatives under a "rule of reason" "in judging whether the

17  agency described those alternatives necessary to permit a reasoned

18  choice." City of Angoon, 803 F.2d at 1020.  The failure to

19  adequately select and analyze a reasonable range of alternatives

20  requires that an agency's action be set aside.  Citizens for a

21  Better Henderson v. Hodel, 768 F.2d 1051, 1057 (9th Cir. 1985)

22  ("The existence of a viable but unexamined alternative renders an

23  environmental impact statement inadequate."); Idaho Conservation

24  League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992).

25      Plaintiffs claim that the BLM failed to consider a reasonable

26  range of alternatives.  Specifically, they raise two different

39

1  purported failures in the agency's analysis.

2       First, they allege that "if the goal of the proposed RRAMP

3  Amendment was to quell local concerns about the impacts of federal

4  land ownership on the local ranching economy then a reasonable

5  alternative would have been to explore different kinds of property

6  ownership [other] than outright purchase."  Pls.' Br. at 31.  By

7  using conservation or public access easements they suggest that the

8  agency could have met the concerns of the Board of Supervisors,

9  without undertaking a significant change in the overall land

10 acquisition policy.[12]  Defendants fail to respond to this critique

11 of the EA.  Rather, the agency simply argues that the "alternatives

12 considered by BLM were reasonably targeted to meet BLM's need to

13 clarify the administrative boundary of Horseshoe Ranch."  Defs.'

14 Br. at 13.  Defendant contends that the agency had "found that the

15 acquisition interest area concept was confusing to the public" but

16 it does not explain why the only option was to eliminate it

17 entirely.  Id.  Moreover, given that the alternative also alters

18 the methods for selecting property for acquisition, the action goes

19 well beyond the tendered goal.

20 _____

21      [12]  Plaintiffs' supplemental brief also, possibly
   inadvertently, identifies a second alternative that would have
22 conflicted less with the concerns identified by Siskiyou County.
   The Board stated that it is "opposed to any expansion of land area
23 under government control to the extent that such control undermines
   the tax base, or impedes the lifestyles of those landowners whose
24 livelihoods remain dependant on the natural resource base."  AR
   00856.  It appears that a policy of only conducting land exchanges
25 as opposed to outright purchases would still have allowed BLM to
   meet the goals set out in the 1993 RRMP, while not expanding
26 federal land holdings, perhaps not undermining the tax base, or
   impeding the local lifestyle.

1   Moreover, as noted above, the agency has an obligation to
2   identify, and briefly explain, which, if any, alternatives were
3   considered for analysis but then rejected.  40 C.F.R. § 1502.14(a).
4   Plaintiffs point to two different "Horseshoe Ranch RMP Amendment
5   Meeting" minutes, from March 6, 2001 and March 13, 2001 which
6   briefly ask the question "What about conservation easements?"  AR
7   00394, 00392A4.[13]  Although the question of conservation easements
8   was raised, the EA does not mention them as an alternative that was
9   considered but then rejected.

10   The other area that the plaintiffs suggest should have been
11   considered as an alternative is the expansion of the HRWA boundary
12   to include the Jenny Creek Area of Critical Environmental Concern
13   and/or to include lands to the west of Interstate 5.  They cite to
14   a number of comments submitted which urged expansion of the area.
15   AR 00121-22.  It appears from the Final EA that BLM rejected these
16   alternatives as being "beyond the geographic scope of the
17   undertaking," perhaps meaning the HRWA and the immediate environs.
18   AR 00122.  This returns us to the issue of the failure to
19   articulate the purpose and scope of the proposed action.  As noted
20   above, there is no way for the court to know, nor for the public
21   to have known the purpose and scope of the proposed action.
22   Accordingly, there was no way to know what a conclusion that
23   something was beyond the geographic scope could mean.
24   ////

25   _____

26   [13]   It is not clear whether this issue was raised in the
public comments submitted on the EA.

41

1    Put directly, the instant alternatives analysis fails simply
2    because it is not possible for the court to determine now, nor the
3    public to determine then, what purpose BLM sought to accomplish.
4    This becomes still more problematic since if, as the government now
5    asserts, "clarification" was the goal, it appears that the agency
6    undertook a radical approach for a simple problem.  Clearly, the
7    agency could have considered options which did not involve
8    amendment at all, but rather focused on a public awareness
9    campaign, an attempt to conduct land exchanges instead of
10   purchases, or other less aggressive approaches.

11   Again, to prepare a proper EA an agency must first define what
12   the project is, what its purpose is, and the scope of the
13   undertaking.  In this regard, it has been consistently held that
14   "an agency cannot define its objectives in unreasonably narrow
15   terms." City of Carmel-by-the-Sea v. United States Department of
16   Transportation, 123 F.3d 1142, 1155 (9th Cir. 1997); Friends of
17   Southeast's Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998)
18   ("An agency may not define the objectives of its action in terms
19   so unreasonably narrow that only one alternative from among the
20   environmentally benign ones in the agency's power would accomplish
21   the goals of the agency's action, and the EIS would become a
22   foreordained formality.") (quoting Citizens Against Burlington,
23   Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991)).

24   Yet again, if the agency's purpose was something as simple as
25   "clarifying" the administrative boundary of the Horseshoe Ranch,
26   clearly the agency should take into account the alternatives

1    adverted to above, and if rejected, the agency would be obligated

2    to provide an explanation as to why they were rejected.   A

3    reasonable range of alternatives should be just that, a range of

4    reasonable actions which might meet the goals of the agency by

5    using different approaches which may reduce the environmental

6    impacts of the agency's action.

7    **D.   CUMULATIVE IMPACTS**[14]

8        A cumulative impact "is the impact on the environment which

9    results from the incremental impact of the action when added to

10   other past, present, and reasonably foreseeable future actions

11   regardless of who undertakes such other actions.   Cumulative

12   impacts can result from individually minor but collectively

13   significant actions taking place over a period of time."   40 C.F.R.

14   § 1508.7; <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161

15   F.3d 1208, 1214 (9th Cir. 1998); <u>Kern v. Bureau of Land Management</u>,

16   284 F.3d 1062, 1075 (9th Cir. 2002) (requiring a thorough

17   consideration of cumulative impacts in the preparation of an EA).

18       It is established that the cumulative impacts analysis must

19   include "some quantified or detailed information" since without

20   such information it is not possible for the court or the public to

21   be sure that the agency provided the hard look that is required of

22   _____

23       [14]  Defendants claim that plaintiffs have not plead the
     failure to consider cumulative impacts.  On the contrary,
     paragraph 21 of the complaint identifies BLM's "failure to analyze

24   fully the cumulative impacts" on the 1993 RRMP, and the plaintiffs'
     prayer for relief also specifically requested that this court order
     BLM to prepare an EIS which "properly gives a 'hard look' at the

25   . . . cumulative impacts of reducing the boundaries of the HRWA

26   . . ."

1  its review.   Neighbors of Cuddy Mountain v. Forest Service, 137

2  F.3d 1372, 1379 (9th Cir. 1998).   If the agency did not present

3  this detailed information and analysis it will be found to have

4  violated NEPA unless it provides a convincing justification as to

5  why more information could not be provided.   Ocean Advocates v.

6  Army Corps of Engineers, 402 F.3d 846, 868 (9th Cir. 2005) (citing

7  Kern, 284 F.3d at 1075 and Muckleshoot Indian Tribe v. Forest

8  Service, 177 F.3d 800, 810 (9th Cir. 1999)).   The Circuit has also

9  explained that this analysis is particularly important in an EA.

10 That is because so many more EAs than EISs are prepared, and thus

11 there is a higher risk of cumulative impacts resulting from the

12 many smaller decisions.   See Native Ecosystems Council v. Dombeck,

13 304 F.3d 886, 896 (9th Cir. 2002); Kern, 284 F.3d at 1076.

14       The cumulative impacts analysis in the EA under consideration

15 is a page long.   It does not mention, nor discuss, any past,

16 present, or future projects being conducted in the area that might

17 result in a cumulative impact.   There is no mention of whether this

18 amendment might impact the overall goal of the RRMP "to consolidate

19 public lands in areas with outstanding recreational opportunities

20 and unusual or imperiled biological resources" while disposing of

21 "existing public lands with limited recreational potential and/or

22 commonplace natural resources."   ROD for the 1993 RRMP, ER 070.

23 Plaintiffs repeatedly note that the Bureau has disposed of 16,982

24 acres of public lands in Siskiyou County, while only acquiring

25 1,657 acres for expansion of the ecologically significant parcels

26 identified in the RRMP.   Defendants do not dispute this fact, yet

44

1   the EA fails to analyze how this decision might have a cumulative

2   impact on the ability of BLM to follow through on the compact it

3   made with the public.

4       A cumulative impacts analysis should examine whether "the

5   action is related to other actions with individually insignificant

6   but cumulatively significant impacts."  Kern, 284 F.3d at 1075.

7   In this case there must, therefore, be a discussion of whether the

8   proposed amendment, when combined with the various public land

9   sales and acquisitions, might have a cumulatively significant

10  impact.[15]  The analysis should set out the past sales and

11  acquisitions in the area and any which may be "reasonably

12  foreseeable" and discuss how the current amendment of the plan,

13  which makes it more difficult for the agency to acquire additional

14  public lands, might result in a cumulative effect on the goals of

15  the plan and on the environment as a whole.[16]

16  ////

17  _____

18      [15]  Plaintiffs point to two places in the record where a BLM
    decision to stop acquiring lands in the Shasta Wetlands was
19  mentioned.  If this is true, this is the sort of fact that should
    be examined in a cumulative impacts analysis.  See, e.g., AR 00448;
20  AR 05041.

21      [16]  Plaintiffs point to a memo written by a BLM staff member
    after conducting a meeting with one member of the plaintiff
22  organizations.  The memo notes that Mr. Pace (of one of the
    plaintiff organizations) and a number of other organizations and
23  individuals were "deeply concerned" by the disproportionate
    disposal of public land in comparison with the acquisitions, and
24  "our current rush to appease a small segment of the local
    population and certain members of the Board of Supervisors by
25  reducing the boundaries of Horseshoe Ranch."  The staff member
    stated "I must admit, I could not argue spiritedly in our defense."
26  AR 05041.

1        Defendants again rely on the unconvincing contention that
2   "this administrative boundary change has no effects on the
3   environment, and likewise does not have an incremental impact when
4   added to other reasonably foreseeable action." Defs.' Br. at 14.
5   First, even if the administrative change has no direct impact, it
6   appears at least possible that there might be indirect impacts.
7   NEPA requires that an EA contain a discussion of reasonably
8   foreseeable future actions both within the study area as well as
9   in the greater area.   Kern, 284 F.3d at 1075; Klamath-Siskiyou
10  Wildlands Center v. Bureau of Land Management, 387 F.3d 989, 994
11  (9th Cir. 2004).  Whatever else is true, it seems relatively clear
12  that the proposed amendment removing the acquisition area will make
13  it significantly more cumbersome for BLM to acquire lands that
14  become available, particularly if they are not directly adjacent
15  to the current public lands boundary.  It therefore seems at least
16  reasonably foreseeable that some of those lands no longer within
17  the acquisition area may be sold to an owner who intends to develop
18  the property, or to increase grazing on the land.

19       The defendants maintain that they included "an analysis of
20  other reasonably foreseeable actions, namely the future potential
21  for conversion of lands near Horseshoe Ranch from private to
22  public." Defs.' Br. at 14.[17]  However, plaintiffs' concern is the
23  failure to convert land to public ownership, and the use of lands
24  that remain in private ownership.

25  _____

26       [17]  Defendants do not provide a citation to where in the EA
    this discussion is to be found.

1      Plaintiffs also note as an asserted deficiency, that the
2   cumulative impacts analysis was not undertaken for each
3   alternative.  They do not cite authority for the proposition that
4   requires that the cumulative impacts be considered for each
5   alternative.  Certain decisions do refer to an EIS which discusses
6   the cumulative impacts of each alternative, but they do not, in
7   terms, make such discussion mandatory.  Others seem to limit the
8   discussion of cumulative effects to that of the proposed action.
9   See, e.g., Churchill County v. Norton, 276 F.3d 1060, 1081 (9th
10  Cir. 2001) (finding that the "Fish and Wildlife Service has taken
11  the requisite 'hard look' at the cumulative environmental impacts
12  of the action alternatives and has not violated NEPA."); but see
13  Kern, 284 F.3d at 1076 (9th Cir. 2002) ("We have interpreted the
14  regulations to require that the EIS consider the cumulative impact
15  of the proposed action." citing Edwardsen, 268 F.3d at 786-90;
16  Neighbors of Cuddy Mountain, 137 F.3d at 1378; City of Tenakee
17  Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990));
18  Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 810
19  (9th Cir. 1999) ("Detail is therefore required in describing the
20  cumulative effects of a proposed action with other proposed
21  actions.")  In sum, the cases do not appear to require a cumulative
22  impacts discussion for each alternative.
23      The defendants argue that the EA is tiering from the EIS
24  prepared for the RRMP.  This contention is without substance.  For
25  an EA to be tiered off another environmental study, there must be
26  some reference to the analysis conducted in the first document.

1  It is true that the regulations on tiering provide that the EA

2  "need only summarize the issues discussed in the broader statement

3  and incorporate discussion from the broader statement by reference

4  . . ." 40 C.F.R. § 1502.20.  Defendants, however, point to no

5  reference or incorporation of the analysis from the EIS to suggest

6  that this is anything more than another fatally defective post-hoc

7  rationalization.  Moreover, as plaintiffs contend, the current

8  action is amending the plan for which the EIS was prepared.  While

9  this would not necessarily preclude tiering to some of the

10 analysis, the EA would have to explain what altered circumstances

11 justify the change.[18]

12 **E.   BIOLOGICAL CONNECTIVITY CORRIDOR**

13     Plaintiffs claim that the defendants had an obligation to

14 consider the value of the Horseshoe Ranch Area as a biological

15 connectivity corridor.  Plaintiffs' opening brief plainly sets out

16 three different places in the administrative process where the

17 issue was brought to BLM's attention.  First, the California

18 Wilderness Coalition, and Felice Pace of KWFA raised the issue in

19 the scoping comments.  AR 04239, 04369-70.  The issue was raised

20 again in comments on the Draft EA by several different parties,

21

22     [18]  Plaintiffs' complaint that defendants included direct or
    indirect impacts in the cumulative impacts section has led to an
23  extended debate over what is a cumulative impact, a direct impact,
    or a indirect one.  While there are undoubtedly significant
24  distinctions to be drawn between the type of impacts, there is no
    question that all of them must be discussed for a NEPA review
25  document to be adequate.  In any event, it is not clear whether the
    inclusion of various types of impacts in the cumulative impact
26  discussion constitutes a NEPA violation.  The fact that cumulative
    impacts were not discussed, however, is clearly a violation.

including the SMWC, the World Wildlife Fund, and the KWFA.  AR

01050-52, 10098-01101, 01102-03.  Finally, it was raised in a face-

to-face meeting with the BLM and Felice Pace.[19]  The issue was also

raised in ¶ 15 of the complaint which states that "[t]he HRWA

provides vitally important biological connectivity functions and

habitat values for wintering deer, elk, and other wildlife living

in the area and moving between the nationally important Cascade-

Siskiyou National Monument area and the Klamath River

headwaters."[20]

    Plaintiffs point to a portion of the Northwest Forest Plan

amending the 1993 RRMP which "directs the BLM to evaluate carefully

the values of the Soda Mountain area as a biological connectivity

corridor and propose any additional management protection

necessary, include a special designation, through the BLM resource

management plan, to protect these values."  Northwest Forest Plan

---

[19]  The memo prepared following the meeting by BLM staff
specifically notes Mr. Pace's concerns on the "regional
connectivity of the planning area to other major public land
holdings to the east, west and north."  AR 05040.

[20]  Defendants' primary response is to claim that the
biological connectivity corridor concerns were not raised in the
complaint and "must first be asserted in the administrative
process."  Defs.' Br. at 15.  As noted in the text, the defendants
are simply wrong.  Indeed, this is constant and unjustified
assertion of the defense which leads the court to worry about any
assertion they make about the record.  Besides being wrong on the
facts, the Ninth Circuit has held that the agency cannot simply
rely on environmental groups to bring new information to the
attention of the government agency, whose responsibility it is to
be aware of the environmental impact of its actions.  See Friends
of the Clearwater v. Dombeck, 222 F.3d 552, 559 (9th Cir. 2000)
(citing City of Davis v. Coleman, 521 F.2d 661, 667 (9th Cir.
1975)).

1    at 30, ER 126.  Given the discussion in the DEIS that was prepared

2    for the creation of the Cascade Siskiyou Ecological Emphasis Area,

3    BLM staff at the very least was charged with knowledge of the value

4    of the area as a biological connectivity corridor and thus was

5    required to consider its value as such.  Any discussion of the area

6    as a biological connectivity corridor should have included

7    consideration of whether the amendment of the plan would, either

8    directly or indirectly, impact the environmental vitality of the

9    corridor.

10        The defendants do not suggest that they considered this issue.

11   Instead, defendants again rely on the assertion that "the redrawing

12   of the RMP Horseshoe Ranch boundary has no environmental

13   consequences, either to the public lands of Horseshoe Ranch or the

14   private lands surrounding it."  Defs.' Br. at 15.  This assertion

15   cannot carry the day.  FLMPA requires the agency to consider the

16   impacts that any amendment has on the plan.  43 C.F.R. § 1610.5-5.

17   An unsupported assertion of no impact fails to meet the regulatory

18   requirement.  At the very least, it was necessary that BLM consider

19   whether the altered regimen for acquisition would effect

20   acquisition and thereby effect the vitality of the corridor.

21   **F.   FLPMA**

22        Under the FLPMA, "[i]n managing the public lands the Secretary

23   shall, by regulation or otherwise, take any action necessary to

24   prevent unnecessary or undue degradation of the lands."  43

25   U.S.C.A. § 1732(b).  The plaintiffs claim that this is the

26   "substantive cornerstone of FLPMA's otherwise largely procedural

framework as it intersects with NEPA." Pls.' Br. at 37.  Section

1701 further states that it is

> the policy of the United States that . . . (8) the
> public lands be managed in a manner that will protect
> the quality of scientific, scenic, historical,
> ecological, environmental, air and atmospheric, water
> resource, and archeological values; that, where
> appropriate, will preserve and protect certain public
> lands in their natural condition; that will provide food
> and habitat for fish and wildlife and domestic animals;
> and that will provide for outdoor recreation and human
> occupancy and use. . .

43 U.S.C.A. § 1701.  Plaintiffs claim that these policy statements,

along with the broader management purposes set out in the 1993 RRMP

require that BLM analyze whether the proposed amendment will create

unnecessary or undue degradation of the public lands.[21]

They point to one area in particular in the proposed plan

which they believe demonstrates possible unnecessary or undue

degradation, or at the very least a contradiction in management

policy.  The selected alternative allows for grazing on sections

21, 22, and 34 of the HRWA and not on the rest of the public land.

The 1993 RRMP asserted that "[a]ll Animal Unit Months (AUMs) are

available for wildlife unless BLM determines that domestic

livestock grazing management would be beneficial to enhance

wildlife habitat."[22]  RRMP at 34, ER 077.  BLM has not provided any

---

[21] Given SUWA, it is important to recognize the narrow nature
of plaintiffs' claim.  They do not argue that a particular result
is mandated, they merely argue that an analysis is mandated.

[22] Plaintiffs maintain that the RRMP provided that grazing
would only be allowed in the Horseshoe Ranch Wildlife Area if it
was found to be beneficial to deer habitat.  The court assumes the
language noted in the text is the language they rely on for this

1 explanation of why grazing would be beneficial in the specified

2 areas but not in the rest of the HRWA, which the EA states has the

3 same ecological properties.

4      Plaintiffs further note that the management policy for

5 Alternative 1 and the selected alternative would have the specified

6 sections managed under the same policy of multiple use.  However,

7 the EA states that management under Alternative 1 could result in

8 "fewer winter deer, reduced vigor, and less fawn survival and

9 recruitment."  The same management policy under the selected

10 alternative, however, does not result in any finding of a

11 significant impact, or any impact for that matter.

12      Plaintiffs maintain that the policy of allowing grazing

13 without a finding of benefit to wildlife, violates NEPA's "hard

14 look" requirement, and violates the unnecessary or undue

15 degradation standard of FLPMA.  They also claim that BLM failed to

16 provide a rational connection between the facts found and the

17 decision made.  <u>Gifford Pinchot Task Force v. U.S. Fish and</u>

18 <u>Wildlife Service</u>, 378 F.3d 1059, 1065 (9th Cir. 2004).

19      Defendants do not respond to these contentions.  Rather, they

20 again argue that the amendment does not cause any on the ground

21 changes to the management of Horseshoe Ranch.  Even if this were

22 true, it does not explain the contradiction in the conclusions

23 noted above.  With regards to the unnecessary or undue degradation

24 standard, the defendants are correct that the standard only applies

25 _____

26 proposition, although the provision is not limited to deer.

to the public lands.  The decision at bar, at the very least appears to make it more difficult to acquire private lands.  That difficulty while it may not have a direct effect on the public lands, may, as discussed above, have an indirect effect.  Accordingly, the Bureau is obligated to consider in its EA whether there will be any unnecessary or undue degradation to the lands as a result of this policy change.

Plaintiffs point to an additional contradiction in the EA. The introductory section of the Final EA states the following:

> BLM has publicly expressed its intention to balance the approximately 17,000 acres of public land transferred from Federal ownership in Siskiyou County since 1993 by acquisitions of environmentally sensitive lands in other parts of the County.  For this reason, and in response to a 1999 request by Siskiyou County, BLM eliminates the extensive area identified in alternatives 2 and 3 for potential federal acquisition of private lands.  BLM does not actively pursue new acquisitions in connection with HRWA.  However, the amendment continues to allow for acquisition from willing sellers of private lands contiguous to HRWA that also meet the criteria for deer winter range.

AR 00005.  Plaintiffs describe this as an Orwellian statement because it states that it will balance the significant amount of public land disposed of in the County by removing a significant acquisition area from further consideration.[23]  Defendants, again, do not respond.

The court must find that, overall, the EA fails to draw rational connections between the facts found and the decision made.

---

[23]  The last two sentences are also difficult to follow.  On the one hand, the BLM says that it will no longer pursue acquisitions, but then say that the amendment continues to allow for more acquisitions.

1  <u>Oregon Natural Resources Council v. Lowe</u>, 109 F.3d 521, 526 (9th

2  Cir. 1997); 5 U.S.C. § 706(2)(A).  Plaintiffs have pointed to two

3  plain internal contradictions in the EA, neither of which the

4  defendants have chosen to respond to.  This is compounded by the

5  absence of a clear purpose statement in the EA.  In order to

6  adequately meet the requirements of NEPA and FLPMA, the Bureau

7  needs to undertake a more considered, transparent, and in-depth

8  review of the potential environmental impacts of the proposed

9  amendment.

10 **G.    FEDERAL ADVISORY COMMITTEE ACT**

11      Defendants' motion for summary judgment seeks to dismiss

12 plaintiffs' fourth claim for relief which alleges a failure to

13 include all interested parties in the initial scoping process for

14 the RRMP amendment.  Plaintiffs have not raised the issue in their

15 own motion nor have they responded to it in their reply and

16 opposition.  It appears, thus, that plaintiffs have waived this

17 claim and it therefore will be dismissed.

18                              **IV.**

19                    **CONCLUSIONS AND ORDERS**

20      The defendants have failed to conduct adequate environmental

21 review as required by FLPMA and NEPA.  Therefore, summary judgment

22 will be granted for plaintiffs and denied for defendants on the

23 question of compliance with FLPMA and NEPA.  BLM shall return to

24 the drawing board and prepare either an adequate EA or a complete

25 EIS which contains a clear statement of purpose and need, which

26 fully analyzes the direct, indirect and cumulative impacts of the

                                54

1   amendment, and which examines a complete set of reasonable

2   alternatives which are tailored to meet the goals set out in the

3   purpose and need statement.

4          The Clerk is directed to ENTER judgment and CLOSE the case.

5          IT IS SO ORDERED.

6          DATED:  March 23, 2006.

7                                    /s/Lawrence K. Karlton
                                     LAWRENCE K. KARLTON
8                                    SENIOR JUDGE
                                     UNITED STATES DISTRICT COURT
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26